IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                   Case No.  21-10035-01,02-JWB

JORGE L. ACUNA GASTELUM, and
LUIS G. PALAFOX VELAZQUEZ,

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on a motion to suppress (Doc. 49) filed by Defendant Acuna-Gastelum (hereinafter "Acuna") and joined in by Defendant Palafox-Velazquez (hereinafter "Palafox"). (Doc. 51.) The motion is fully briefed. (Docs. 58, 61.) The court held an evidentiary hearing on the motion on July 15, 2022, and took the matter under advisement. For the reasons stated herein, the motion to suppress is DENIED.

**I. Facts**

The court finds the following facts – which are largely undisputed – from the evidence presented at the suppression hearing. Kansas Highway Patrol ("KHP") Troopers J.C. Parr and Austin Ackerman were each on duty in their respective vehicles on February 17, 2021, near Meade, Kansas. Parr has about twenty years of experience with the KHP. He is part of a specialty unit involved in detecting and apprehending individuals using Kansas highways for illegal purposes including drug trafficking, sex trafficking, and human trafficking. Trooper Ackerman has been with KHP about two years. Ackerman and his dog "Rosko" are certified by the KHP as a Narcotic Detection Dog Team.

Sometime in the morning or early afternoon of February 17, Parr was telephoned by Task Force Officer Richards, a KHP officer affiliated with a DEA task force, who gave Parr a tip about a vehicle suspected of smuggling drugs.  Parr had received five or six such tips in the past.  The tip was that a burgundy Honda Accord with an Arizona temporary license tag, traveling from Phoenix to Kansas City, was smuggling illegal drugs.  Parr understood the tip was not a "probable cause tip," meaning he understood he was not authorized to stop the vehicle based on the tip, and that if he did not observe a traffic violation he could not stop the vehicle.  Parr contacted Ackerman and asked him to be available with his drug detection dog should Parr make a traffic stop.

Parr was parked on the south side of U.S. Highway 54, perpendicular to the highway and facing it, just northeast of Meade, Kansas. Parr testified he frequented this spot because it allowed him to observe both eastbound and westbound traffic.[1]  The highway directly in front of Parr had four lanes – two for eastbound traffic and two for westbound traffic – but just to the northeast of Parr, and within his view, the highway narrowed to two lanes – one for each direction of traffic. Parr testified that traffic infractions or violations were common at this spot.

Shortly after 3:30 p.m., Parr saw a burgundy Honda Accord with a temporary tag pass in front of him heading eastward.  The vehicle was in the outside (right) lane as it went by.  Parr clocked the vehicle on radar; it was going 53 miles per hour in a 65 mile per hour zone.  When the vehicle reached the portion of the highway where the two eastbound lanes are reduced to one, the Honda followed the outside "fog line" (the solid white line nearest the shoulder) as that line angled inward toward the inside (left) lane.  Parr observed that the car did not use a turn signal as it continued on in the sole remaining lane.

---

[1] At this particular point Highway 50 curves and runs to the northeast and southwest, but for the sake of simplicity the court refers to eastbound and westbound traffic, which reflects the highway's predominant orientation.

Parr testified there is a traffic control sign a short distance west of where the two lanes converge into one, warning eastbound drivers that the outside (right) lane ends. The Honda would have passed by this sign as it traveled eastward. As shown by Government Exhibit 5, which is depicted below, this yellow traffic sign has no writing on it. It depicts two solid vertical lines with a partial vertical dotted line in between, roughly depicting the lines on the roadway. Toward the bottom of the sign, the solid line on the right is parallel to the solid line on the left, but about halfway up, the right line angles inward towards the left line, reducing the width between the two. At the point where the right line first starts to angle in, the dotted line in between the two solid lines ends. Above that, the right solid line again "straightens" out such that it is again parallel to the left solid line, but closer to the left line.



Government Exhibit 5.

The following exhibit displays the image of the portion of the highway where the two lanes are reduced to one:



Government Exhibit 9.

Parr pulled out after the Honda and turned on his emergency lights to make a traffic stop. Parr testified he made the stop because he believed the driver's failure to signal the car's movement to the left on the roadway violated K.S.A. 8-1458.   He radioed the dispatcher to check on the vehicle's temporary license tag.

The stop was initiated at 3:37 p.m.  Parr approached the passenger side of the Honda; there were two occupants inside.  Acuna was driving and Palafox was in the front passenger seat. The men rolled down the passenger window.  Parr introduced himself, extended his arm inside the car

to shake hands with the driver, and asked how the men were.  Parr could smell the scent of air freshener coming from the car and saw three air fresheners hanging from the rear view mirror. Parr discerned there was a language barrier and asked if the men spoke English.  They said in Spanish they only spoke "poquito" – a little.  Parr speaks some Spanish but is not fluent. Alternating between Spanish and English, Parr told Acuna he stopped the car for failing to signal a lane change and asked for Acuna's driver's license or identification.  Acuna produced a Mexican passport and a Sinaloa, Mexico identification card.  Parr asked Acuna to come with him to the patrol vehicle so Parr could contact a Spanish translator.  Acuna sat in the front seat of the patrol car as Parr initiated a request for a Spanish translator through a service used by the KHP.  A computerized service indicated all of the translators were currently busy but that Parr would be connected with the next available translator.  Parr began typing in Defendant's information and sought to determine whether he had a driver's license, whether he had any warrants, and whether the car was stolen.

Within three or four minutes of the initial stop, Trooper Ackerman arrived with Rosko. Parr informed Ackerman there was one front seat passenger and asked Ackerman to run his dog around the car.  While Parr continued checking license information, Ackerman went to the Honda and spoke to Palafox through the Honda's open passenger window.  Ackerman asked Palafox to step out and stand in front of the vehicle. Ackerman opened the passenger door and Palafox got out and stood in front of the car.  Ackerman retrieved Rosko and, beginning at the rear passenger side of the Honda, began leading the dog around the car.  Ackerman guided Rosko close to the vehicle and gave him a "find" command.  Rosko began sniffing around the car, at times brushing against it.  Rosko is trained to detect methamphetamine, marijuana, heroin, and cocaine.  He is trained as a passive indicator, meaning he will lay down or sit if he detects the odor of a controlled

substance.  When Rosko reached the driver's side rear door, he raised up and sniffed near the door and abruptly sat down.  Ackerman concluded from his training that this indicated Rosko had detected an odor of narcotics.  Ackerman informed Parr the dog had indicated there were narcotics in the car.  The sniff itself took about thirty seconds.  At that time, Parr was still waiting on an interpreter and trying to obtain information to determine whether Acuna had a driver's license and whether he had any warrants.

Parr asked Ackerman to see if Palafox needed a jacket from the vehicle – it was cold outside – and told him to check the pockets and not let Palafox use a phone.  Parr asked Acuna if there were any "drogas" in the vehicle; Acuna said no, but then indicated his friend might have smoked a little marijuana in the car.  Meanwhile, Palafox opened the trunk of the Honda to retrieve a jacket. Ackerman checked the pockets of the jacket and handed it to Palafox.  They left the trunk of the Honda open. Parr had Ackerman put Palafox in Ackerman's car while Parr waited on a translator.

Acuna told Parr in English, with some difficulty, that he lived in Phoenix and often worked in Kansas framing houses, while his friend did concrete work. Parr, having not heard from the translation service for several minutes, decided to call a local translator he sometimes used. With the aid of the translator on a speaker phone, Parr spoke with Acuna for a few minutes, explaining the reason for the traffic stop, saying he would not be receiving a ticket, and asking whether Acuna had ever had a driver's license in any state in the United States.  Acuna said no; he had only a license in Mexico.  Parr informed Acuna the dog had alerted on the car and asked if someone had been smoking marijuana in the car recently.  Acuna said he had not but he had a friend with a medical marijuana card who had smoked in there three days ago.   Acuna denied there were any drugs in the car.  Parr informed Acuna that because the dog alerted on the car, he was going to do a search to make sure there were no illegal drugs.  Acuna requested that he be allowed to go to the

bathroom in the ditch by the road; Parr allowed him to do so.  At that point a total of about 15 minutes had elapsed from the initial stop.

Parr patted Acuna down and returned him to the front seat of Parr's vehicle.  Parr told Ackerman they were going to search the vehicle because of the dog alert and the admission that someone had smoked marijuana in the car.  Parr also pointed out he had seen a gas can in the open trunk of the Honda and told Ackerman, "you know what that usually means."  Parr was aware from his experience and training that drug traffickers sometimes conceal drugs in a vehicle's gas tank, and that they may carry spare containers of gas because the fuel tank's volume is reduced by the drugs and the fuel gauge may be rendered inaccurate.

Parr took some photos of items in the car.  As he opened the car doors to do so, he commented that there was a "strong odor" of air freshener coming from the car.  Parr observed there were several air fresheners hanging from the rear view mirror, as well as one hanging from the overhead in the rear of the passenger compartment.  Parr was aware from training that drug traffickers may use air freshener to help mask the odor of illegal drugs. Parr noted there were two gas cans in the trunk and told Ackerman, "that usually means a gas tank load."  Parr retrieved a scope from his vehicle that he used to visually examine the interior of the gas tank.  When Parr inserted the scope, he could see wrapped packages in the tank.  He concluded that the fuel tank was loaded with drugs.  Defendants were arrested at that point.  In a subsequent search of the gas tank, officers retrieved packages that testing indicated to be 25 pounds of methamphetamine, one pound of heroin, and one pound of fentanyl pills.

## II. Analysis

**1.  Traffic stop**.  Defendants argue the government has not shown that Acuna failed to signal on the highway.  Even if Acuna did fail to signal, Defendants argue any such failure did not

justify a traffic stop under K.S.A. 8-1458.  Defendants argue the Honda did not turn or move on the highway, as contemplated by K.S.A. 8-1548, because it "traveled straight ahead" in the right lane as that lane merged with the left lane.

The court finds Parr's testimony credible that the Honda did not signal at the point where the two lanes converged.  No contrary evidence was presented, and the trooper's testimony was sufficient to show that Acuna failed to use a signal.  Whether K.S.A. 8-1548 required the use of a signal under those circumstances is more problematic.  The statute provides in part that "[n]o person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided."  K.S.A. 8-1548(a).  It further provides that "[a] signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning."  K.S.A. 8-1548(b).

The government argues the Honda moved left upon the roadway and was therefore required to give a signal.  The application of K.S.A. 8-1548 in these circumstances is decidedly ambiguous, as it is not clear what constitutes a "move … left" within the meaning of this provision.  All movement is relative – that is, the movement of one object can only be observed or measured by assessing its position in relation to some other object.  A vehicle's movement "left" upon the roadway assumes movement with respect to some other reference point, but the statute does not clarify what that point is.  Moreover, the statute requires a signal for a "turn" or a "move," but then specifies only that the signal shall be given for 100 feet "before turning."  Judge Melgren addressed a similar factual situation in *United States v. Morales,* 115 F. Supp. 3d 1291 (D. Kan. 2015).  Although he was "skeptical that this merge without signaling was unlawful," Judge Melgren concluded the stop was reasonable, even if the officer was mistaken about the law, because any

mistake was objectively reasonable. *Id.* at 1296. For reasons set forth below, the court reaches a similar conclusion here.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). An initial traffic stop is justified at its inception if "an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). "Reasonable suspicion requires that an officer provide 'some minimal level of objective justification.'" *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (citing *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). This requires only "a showing considerably less than preponderance of the evidence." *Id*. at 1263 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The court's standard for evaluating a traffic stop is objective, rather than subjective. *Winder*, 557 F.3d at 1135.

In *Heien v. North Carolina*, 574 U.S. 54 (2014), the Supreme Court held that a traffic stop may be permissible under the Fourth Amendment even if it is based on an officer's mistake of law, so long as the mistake is objectively reasonable. *Id.* at 55 ("More than two centuries ago, this Court held that reasonable mistakes of law, like those of fact, could justify a certificate of probable cause.") "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* at 60-61. This principle is not limited to reasonable mistakes of fact, because "reasonable men make mistakes of law, too, and such mistakes are no less compatible

with the concept of reasonable suspicion." *Id.* at 61.  In *Heien*, an officer stopped a vehicle with only one working brake light because he believed this violated a state law.  After the stop led to other charges and the defendant appealed, a state appellate court found the stop violated the Fourth Amendment because the statute only required that a vehicle be equipped with "a stop lamp," such that it did not require *two* working brake lights.  When that ruling was appealed, the state supreme court found there was no Fourth Amendment violation because the officer's mistaken understanding of the vehicle code was reasonable.  The United States Supreme Court affirmed the latter conclusion, noting there was additional language in the statute alluding to multiple stop lamps, and observing that the provision had never previously been construed by the state's appellate courts.  *Id.* at 68.  "It was thus objectively reasonable for an officer [in this position] to think that Heien's faulty brake light was a violation of North Carolina law," and this reasonable mistake of law meant there was reasonable suspicion justifying the stop.  *Id.*

As Judge Melgren pointed out, even though K.S.A. 8-1548 is not entirely clear, "other courts have upheld stops in similar – though not identical – circumstances."  *Morales*, 115 F. Supp. 3d at 1295 n.7  (citing *United States v. James*, 2014 WL 1923695, at *2 (D. Kan. May 14, 2014) (finding that the statute requires a signal when a vehicle moves right or left even if a vehicle does not completely cross a lane marker) and *State v. Favinger*, 2011 WL 2535014, at *3 (Kan. App. June 17, 2011) (finding that the statute's plain text suggests that a signal is required before "any movement right or left," rejecting argument that the statute only applies to complete lane changes). In *James*, Judge Marten addressed the stop of a vehicle based in part on its failure to signal where a highway changed from two lanes to one.  He found the stop was reasonable, stating that K.S.A. 8-1548 "requires 'an appropriate signal' not simply when a lane change occurs, but whenever the vehicle makes any substantial 'move[ment] right or left.'"  *Id.* at *2.  In *United States v. Ortega*,

379 F. Supp. 2d 1177, 1183 (D. Kan. 2005), Judge Robinson held that K.S.A. 8-1548 required a driver to give a signal when merging onto an interstate from an on-ramp because "he moved right upon a roadway from the on-ramp onto the highway." *See also United States v. Sanchez-Vela*, No. 05-40032-02-JAR, 2005 WL 3068333, at *3 (D. Kan. Nov. 16, 2005) ("The Court finds that a motorist's failure to signal when moving from the on-ramp onto an interstate or highway raises at least a reasonable suspicion that a violation of K.S.A. 8–1548 occurred.")  Against this backdrop, Defendants cite no Kansas case holding that a driver's failure to signal in similar circumstances is not a violation of K.S.A. 8-1548.  Nor does the language of the statute clearly preclude the possibility of a violation in these circumstances, as there is a plausible textual basis for concluding that Acuna's vehicle, when it followed the angled fog line and moved closer to the yellow center lines, did in fact "move … left upon a roadway," and was thus required to give "an appropriate signal."[2]  K.S.A. 8-1548.

An officer in Parr's position could reasonably believe that Acuna's failure to signal was a violation of K.S.A. 8-1548.  Even if, as Defendants contend, that belief was mistaken under Kansas law, the court concludes the belief was objectively reasonable.  As such, the stop of the vehicle was supported by reasonable suspicion of a traffic violation and was reasonable under the Fourth Amendment.

2.  **Dog sniff**.  Defendants next contend Trooper Ackerman and his dog unconstitutionally searched the Honda because "the canine repeatedly touched [Acuna's] vehicle when searching for narcotics," which was a "governmental trespass" because it involved the physical touching of the Honda.  (Doc. 49 at 8-9) (citing *United States v. Jones*, 565 U.S. 400, 404 (2012) (attaching a GPS unit to a vehicle to track its movements was a trespass that violated the owner's Fourth Amendment

---

[2] Nevertheless, that same vehicle could not be said to have moved at all relative to the fog line, thus illustrating the problematic application of K.S.A. 8-1548 to a lane merger situation.

rights)).  For the reasons that follow, the court finds that the dog sniff of the Honda was reasonable and did not violate Defendants' Fourth Amendment rights.

In *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court found that "the use of a well-trained narcotics detection dog – one that 'does not expose noncontraband items that otherwise would remain hidden from public view' … -- during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* at 409.  The Court said the dog sniff "was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," and "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."  *Id.*  *Cabelles* would be dispositive here were it not for several later Supreme Court decisions, which require additional analysis, but which ultimately do not alter the court's conclusion that the dog sniff was reasonable.

In *Jones*, the Supreme Court determined that physically mounting a GPS receiver on the undercarriage of a vehicle in order to track its movements was a search under the Fourth Amendment.  The Court made clear the "*Katz* test," which protects a person's "reasonable expectations of privacy," is not the sole basis for judging Fourth Amendment rights.  Fourth Amendment law was traditionally tied to common-law trespass, and the Court said that body of law – which is based upon property rights that protect against physical intrusion on protected areas – remains viable in addition to the *Katz* test.  *Jones,* 565 U.S. at 409 ("The *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test.")  Thus, when the government commits a trespass by engaging "in a physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Id.* at 407 (citation omitted.)  And "[b]y attaching the [GPS] device to the [vehicle], officers encroached on a protected area."  *Id.* at 410.

In *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court held that an officer's use of a drug-sniffing dog on the front porch of a home to investigate the contents of the home was a search within the meaning of the Fourth Amendment.  The Court noted that the curtilage – the area immediately surrounding the home – was regarded in Fourth Amendment law as part of the home itself, and the Court said the right to be free from unreasonable governmental intrusion into the home is at the "very core" of the Fourth Amendment.  *Id.* at 6.  When officers physically intruded on this constitutionally protected area for the purpose of gathering information – by means of a dog trained to detect drugs – they exceeded the implied license that allows visitors to approach and knock on the front door of a home, and they engaged in a search within the meaning of the Fourth Amendment.

Although the foregoing cases identify principles relevant to the case at hand, they do not support a finding that the dog sniff was an unreasonable search under the Fourth Amendment.  *Cf. United States v. Cordero*, No. 5:13-CR-166, 2014 WL 3513181, at *9–10 (D. Vt. July 14, 2014) (noting *Caballes* held that a dog sniff during a traffic stop does not violate the Fourth Amendment and finding "[t]he courts that have considered [the issue] … post-*Jardines* have reached this same conclusion.") *See also United States v. Seybels*, 526 F. App'x 857, 859 n.1 (10th Cir. 2013) ("The recent decision in [*Jardines*], that entry onto a home's curtilage to conduct a dog sniff is a search, was based on property rights not implicated in the traffic stop context and, hence, did not undermine *Caballes*,")  This is true for two reasons, either of which is sufficient to refute the claim of a Fourth Amendment violation.  First, the court finds no authority for the proposition that the momentary light touch of the exterior of a vehicle or other personal conveyance by a dog – or a person, for that matter – on a public roadside, amounted to a trespass at common law.  Nor can this particular touching – which obviously caused no damage whatsoever and is barely discernible

from a video of the incident – reasonably be said to have infringed in any meaningful way upon Acuna's property rights in the vehicle.  This momentary touching is materially different from the officers' physical intrusion to conduct a search on the porch of a home in *Jardines* and even from the physical attachment of a tracking device to the undercarriage of a vehicle in *Jones*.  It is one thing to say property law has conferred upon the owner of a vehicle the right or reasonable expectation of excluding others from physically attaching a tracking device to his car without consent.  But it is qualitatively different to suggest property law has conferred a right or expectation of precluding any person or dog from momentarily touching the exterior of a vehicle or other conveyance located in a public place.  At common law, "[t]he interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel.."  *Restatement (Second) of the Law of Torts* § 218, cmt. e.  Rather, liability arises only if intermeddling with the chattel "is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected…."  *Id.  See also id*., cmt. i, illustration 3 ("A leaves his car parked in front of a store.  B releases the brake on A's car and pushes it three or four feet, doing no harm to the car.  B is not liable to A.")  The absence of any trespass analog to these facts distinguishes *Jones* and *Jardines* and supports a finding that the sniff did not violate Defendants' Fourth Amendment rights.

A second reason for the court's conclusion is that there is no evidence that the touching of the car in fact aided the dog in detecting the odor of narcotics.  The video indicates Rosko began raising up when he was close to the rear passenger door because he detected an odor of narcotics in the air, and he almost immediately sat down.  While the dog's closeness to the vehicle

undoubtedly aided in his detection of an odor emanating from the car, it is unlikely that the source of the odor was on the exterior surface of the vehicle itself, and it is implausible that the dog's touching of the vehicle materially aided the dog in any way in detecting the odor. The evidence shows that with or without a touch, the dog would have alerted. *Jones* recognized that an actual trespass is not sufficient to establish a constitutional violation, and that it is where the government "*obtains information by physically intruding*" on a constitutionally protected area that a search has occurred. *Jones*, 565 U.S. at 408 n. 5. Because the evidence shows no information was obtained from any touching of the exterior of the car by the dog, the sniff was not an unreasonable search within the meaning of the Fourth Amendment.[3]

One final point bears mention. In *Rodriguez v. United States*, 575 U.S. 348 (2015), the Supreme Court made clear that absent reasonable suspicion, police may not extend or delay a traffic stop beyond the time reasonably required to complete the mission of the traffic stop in order to conduct a dog sniff. *Id.* at 357 ("The critical question … is not whether the dog sniff occurs before or after the officer issues a ticket, … but whether conducting the sniff 'prolongs' – i.e., adds time to – 'the stop.'") *Rodriguez* is not implicated here, because the evidence showed the dog sniff did not delay the legitimate mission of the traffic stop. Acuna was unable to produce a driver's license and Parr was working diligently to obtain information related to the traffic stop, including license and warrant information and the services of an interpreter, at the time the dog sniff was concluded. *See id.* at 355 (ordinary inquiries incident to a traffic stop include checking the driver's

---

[3] The court also rejects as unsupported by the evidence any suggestion that Ackerman purposely directed or caused the dog to touch the vehicle in such a way that the alert was a product of the touching. At most Ackerman herded the dog close to the vehicle such that the dog's side brushed against it. *Cf. United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (stating "it is conceivable that by directing the drug dog to touch the truck and toolbox in order to gather sensory information about what was inside, the border patrol agent committed an unconstitutional trespass or physical intrusion," but declining to decide the issue and concluding the exclusionary rule did not apply under the circumstances.)

license, determination whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance).

In sum, the court finds the traffic stop of the vehicle, the detention of the defendants, and the dog sniff of the car were all reasonable under the Fourth Amendment.  Rosko was shown by the evidence to be a trained and reliable indicator of the presence of unlawful drugs, and his alert was sufficient, together with the other facts known to the officers at the time, to provide probable cause to search the vehicle's interior.  *Florida v. Harris*, 568 U.S. 237, 248 (2013) ("The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.")  The evidence shows no Fourth Amendment violation and no basis for suppression of evidence.[4]

### III.  Conclusion

Defendants' motion to suppress (Doc. 49) is DENIED.  IT IS SO ORDERED this 3rd day of August, 2022.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

---

[4] To the extent Acuna attempts to raise other issues, the court rejects them.  For example, in a footnote in his reply brief Acuna points to the fact that Ackerman opened the passenger door when he had Palafox stand outside the car. Acuna argues this this constituted a search, that it allowed Ackerman to smell any odors in the car, and that it allowed "odors inside the car to partially waft outside, thereby directly exposing the odors to Trooper Ackerman's dog." (Doc. 61 at 7 n.3.)  The evidence at the hearing, however, showed that Parr had already detected an odor of air freshener coming from the car by the time Ackerman opened the door, that Ackerman did not gain any information from opening the car door, and that there was no "wafting" of odors – partial or otherwise – as shown by the fact that Rosko moved rapidly past the passenger side of the car and only alerted when he reached the rear portion of the driver's side of the car.  *See also Maryland v. Wilson*, 519 U.S. 408, 413–415 (1997) (passengers may be required to exit vehicle stopped for traffic violation).